IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| PATTY PRATT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:23-cv-417 (RDA/LRV) |
| | ) |
| SCIENCE APPLICATIONS | ) |
| INTERNATIONAL CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Science Application International Corporation's ("SAIC" or "Defendant") Motion for Summary Judgment (the "Motion"). Dkt. 26. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with Defendant's Memorandum in Support (Dkt. 27), Plaintiff Patty Pratt's Opposition (Dkt. 33), Defendant's Reply (Dkt. 34), and the parties' various notices regarding supplemental authority (Dkt. Nos. 38, 39, 40), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.

## I.      PROCEDURAL BACKGROUND

On March 29, 2023, Plaintiff filed her Complaint in this action asserting five counts of disability discrimination under the Americans with Disabilities Act ("ADA"). Dkt. 1. On May 12, 2023, Defendant filed its Answer. Dkt. 8. Thereafter, a Scheduling Order issued, and the case proceeded to discovery. Dkt. 9.

On October 3, 2023, Defendant filed the instant Motion. Dkt. 26. On October 17, 2023, Plaintiff filed her Opposition. Dkt. Nos. 29; 33. On October 23, 2023, Defendant filed its Reply.

Dkt. 34. After briefing was completed, Defendant filed two Notices of Supplemental Authority. Dkt. Nos. 38; 39. Plaintiff then filed a response to Defendant's Second Notice of Supplemental Authority. Dkt. 40.

## II.   UNDISPUTED STATEMENT OF FACTS

Before analyzing the Motion at issue here, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact. Defendant appropriately set forth its Statement of Undisputed Facts with citations to the record as required by the Local Rules. Dkt. 27 at 1-11; E.D. Va. L.R. 56(B) (requiring the moving party to list all material facts as to which there is no genuine issue and to cite to portions of the record). Plaintiff, however, failed to comply with the Rules or the Rule 16(B) Scheduling Order.[1] The Rule 16(B) Scheduling Order specifically instructs a party opposing summary judgment to "include a separately captioned section within the brief addressing, in numbered paragraph form corresponding to the movant's section, each of the movant's enumerated facts and indicating whether the non-movant admits or disputes the fact with appropriate citations to the record." Dkt. 11 ¶ 12(f). Plaintiff failed to do so. By failing to specifically identify disputes in the manner required by the Rule 16(B) Scheduling Order, Plaintiff has placed the burden on the Court to determine which facts set forth by Defendant she disputes. *See United States v. Prince*, 2011 WL 13092084, at *4 (E.D. Va. June 13, 2011) (warning that "Judges are not like pigs, hunting

---

[1] Rule 56 requires the party opposing summary judgment to cite to the record when arguing that there exists a genuine issue of material fact and provides that courts may "consider the fact undisputed for purposes of the motion" or "issue any other appropriate order" if a party "fails to properly address another party's assertion of fact." Fed. R. Civ. P. 56(c)(1), (e). Similarly, Local Rule 56(B) also provides that "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted." Local Civ. R. 56(B).

for truffles buried in briefs" with respect to issues concerning whether an asserted undisputed fact is controverted by the record).

Plaintiff has also improperly set forth her own statement of facts in her Opposition to Defendant's Motion for Summary Judgment. *See* Dkt. 33.[2]  As judges in this District have repeatedly instructed parties, "[n]either the rules nor case authority permit this" and, again, it makes it "difficult to determine exactly which material facts are disputed." *Tankesley v. Vidal*, 2023 WL 4273763, at *10 (E.D. Va. June 23, 2023).  Nonetheless, the Court has reviewed all of the parties' submissions[3] and determined that the following facts are undisputed:

1. Plaintiff asserts that she suffers from polycythemia and erythrocytosis as well as autism. Dkt. 33, PSF 1-2.

2. In June 2019, Defendant hired Plaintiff to work with a government customer, the National Reconnaissance Office (the "NRO"), at the NRO facility.  Dkt. 27, DSF 1; Dkt. 33, PSF 4.

---

[2] Confusingly, Plaintiff has asserted *all* of the facts that she believes are relevant to the Motion under the heading "Statement of Disputed Material Facts," even where facts are clearly not disputed (such as Plaintiff's hiring dates).  For ease of reference, the Court will refer to facts asserted by Defendant as "DSF" and the facts asserted by Plaintiff as "PSF."

[3] Where Defendant's asserted undisputed fact does not appear to correspond to any alleged "disputed" fact asserted by Plaintiff, the Court finds that the fact is deemed admitted. *See, e.g., JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (movant's statement of undisputed facts is properly deemed admitted where brief in opposition fails to "identify with any specificity which facts, if any, were disputed") (citing Local Civ. R. 56(B)); *Hayes v. Sotera Defense Solutions, Inc.*, No. 1:15cv1130(JCC/IDD), 2016 WL 2827515, at *2 (E.D. Va. May 12, 2016) ("Any facts listed in the moving party's listing of material facts which are not specifically controverted in the non-moving party's statement of facts in opposition to the motion will be deemed to be admitted for purposes of [a] motion for summary judgment.") (citing Local Civ. R. 56(B)); *Ferguson v. Holder*, No. 1:14-cv-1641, 2015 WL 1117148, at *1 (E.D. Va. Feb. 9, 2015) (movant's statement of undisputed facts is "appropriately deemed admitted and governs th[e summary judgment] record" where non-movant fails to comply with Scheduling Order's provision regarding statement of facts); *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 600 (E.D. Va. 2000) (failure to file a timely response may properly be deemed as an admission to movant's statement of facts).

3. Plaintiff had a TS/SCI clearance. Dkt. 27, DSF 2.

4. Plaintiff's position, and in particular her classified program, required her to perform work at the NRO site. *Id.*, DSF 3.

5. Plaintiff's classified assignments required the use of the classified NRO computer at the NRO site, in a Sensitive Compartmented Information Facility ("SCIF"), due to the security concerns regarding the classified information on which she worked. *Id.*, DSF 5-6.

6. At the NRO site in Chantilly, Virginia, Plaintiff shared an office with her SAIC first-line manager, Phillip Palmieri, and used the office to access the NRO computer. *Id.*, DSF 4; Dkt. 33, PSF 5-6.

7. SAIC Office Lead William Baracat was Plaintiff's second-line manager and Deputy Contract Manager Daniel McGibney oversaw the contract on which Plaintiff worked for the NRO. Dkt. 27, DSF 11, 14; Dkt. 33, PSF 5.

8. Plaintiff was unable to perform the classified part of her NRO duties at her home because her home is not a SCIF; nor would Plaintiff be able to bring classified NRO materials to her home. Dkt. 27, DSF 7.

9. In response to the COVID-19 pandemic, Defendant implemented various policies and practices to prevent the spread of COVID-19. The policies were updated several times during the course of the pandemic and included policies regarding masks or face coverings. *Id.*, DSF 8.

10. The NRO also implemented requirements related to COVID-19, which included policies regarding appropriate mask and face coverings. Contractors, like Defendant, and their employees, like Plaintiff, were responsible for knowing and adhering to customer protocols regarding mask compliance. *Id.*, DSF 9; Dkt. 33, PSF 10.

11. The NRO issued a "Notice to Industry Partners" providing that, effective May 17, 2021, those not fully vaccinated against COVID-19 must continue to wear masks until further direction. Dkt. 27, DSF 10.

12. Plaintiff was not vaccinated against COVID-19. *Id.* During the course of the events at issue, Plaintiff declined to provide her vaccination status and was therefore considered unvaccinated (as was, indeed, the case). Dkt. 33 at 4 n.2.

13. On May 24, 2021, the NRO issued a Consolidated Guidance, which included the same masking guidance. Dkt. 33, PSF 11; Dkt. 29-10.

14. In May 2021, Mr. Baracat received a complaint from NRO Chief of Staff, Sharon Vail, indicating that individuals were complaining to her regarding Plaintiff not wearing a mask while at work. Dkt. 27, DSF 11.

15. On May 18, 2021, Mr. Baracat met with Plaintiff about the complaint and Plaintiff advised him that she could abide by the regulations. *Id.*, DSF 12.[4]

16. Despite informing Mr. Baracat that she would comply with NRO's requirements, Mr. Baracat received another complaint from Ms. Vail, on May 24 or 25, 2021, that Plaintiff had not been observing the masking requirements while at the NRO. *Id.*, DSF 13.

17. On May 28, 2021, Mr. McGibney and Mr. Baracat met with Plaintiff regarding NRO's complaints that Plaintiff was not wearing a mask. *Id.*, DSF 14; Dkt. 33, PSF 12.

18. Plaintiff informed Mr. McGibney and Mr. Baracat that she had medical conditions that made it difficult for her to wear masks for an extended period of time. Dkt. 27, DSF 14; PSF 13.

19. Mr. McGibney and Mr. Baracat informed Plaintiff that a cloth face covering was not compliant with CDC or NRO guidance. Dkt. 33, PSF 14. They advised that Plaintiff would need to seek a reasonable accommodation. Dkt. 27, DSF 14.

20. It was then determined that, because Plaintiff worked at the NRO site and the NRO on-site guidelines governed, Plaintiff should request a reasonable accommodation from the NRO. *Id.*, DSF 15.

21. Plaintiff was advised that she could not return to work at the NRO facility until she received an accommodation from the NRO and, until such time she would need to take leave. *Id.*, DSF 15; Dkt. 33, PSF 14.

22. Plaintiff submitted a reasonable accommodation request that same day, May 28, 2021, requesting not to wear a mask at all in public places. Dkt. 27, DSF 18; Dkt. 33, PSF 15.[5]

23. Plaintiff used paid time off ("PTO") to cover the time that she was on leave while her accommodation request was pending. Dkt. 27, DSF 17.

---

[4] Plaintiff does not address the May 18, 2021 meeting in her statement of facts. Although the cited portions of Mr. Baracat's deposition transcript do not directly state that the meeting occurred on May 18, the surrounding portions of the deposition reflect that Mr. Baracat met with Plaintiff on May 18. Dkt. 27-4 at 29:2-4, at 30:5-12.

[5] Plaintiff characterizes her request as a "request to wear her face covering instead of a conventional mask with ear loops." Dkt 33, PSF 33. The exhibit that she cites, although difficult to read, appears to have been a later request from July 2021 – not May 2021. Dkt. 29-2. Plaintiff's deposition testimony and exhibits, cited by Defendant, however, make clear that the May 28, 2021 request was intended to avoid wearing any mask at all. Dkt. 27-1 at Deposition Exhibit 3 ("Based on medical criteria, Patricia Pratt should be considered exempt from all regulations of wearing a face mask in public . . . ."). Accordingly, Plaintiff has failed to support her asserted fact that the request was to wear a different type of mask.

5

24. Plaintiff worked with Jewell Bailey, the NRO Chief of Accommodations, regarding her exemption request. Dkt. 27, DSF 19.

25. Plaintiff was required to provide additional medical information regarding her request. On June 7, 2021, Plaintiff provided Ms. Bailey with a note from Dr. Alexandria Herbek, which provided that Plaintiff should socially distance, "avoid[] masked contact with others for greater than 5 minutes at a time" and, if Plaintiff was "able to tolerate a facial covering of any kind (ie [sic] loose fitting scarf) when travelling throughout the work site, then a facial covering may be worn." *Id.*, DSF 22; Dkt. 27-1 at Deposition Exhibit 4.

26. On June 8, 2021, Mr. McGibney spoke with Ms. Bailey regarding Plaintiff's accommodation request and Ms. Bailey advised that a decision had not yet been made. *Id.*, DSF 20.

27. On June 17, 2021, NRO Chief Medical Officer Dr. Clyde Manning stated that, if certain information was correct, then Plaintiff's cloth face covering could meet the CDC standard without the need for an accommodation. Dkt. 33, PSD 16; Dkt. 29-12.

28. On June 22, 2021, Plaintiff submitted a letter from a medical provider in Indiana, Dr. Syed Haider, which stated that Plaintiff should not wear any kind of face covering when she was experiencing a hypoxia event. Plaintiff has stated that, if she wears a mask for longer than five minutes, she could experience a hypoxia event. *Id.*, DSF 23.

29. Plaintiff therefore agreed to wear a scarf as a face covering for up to five minutes of time. *Id.*, DSF 24.

30. On June 28, 2021, Ms. Bailey emailed Plaintiff, informing Plaintiff that she could wear a scarf as a face covering in common areas. *Id.*, DSF 25; Dkt 33, PSF 17.

31. Plaintiff then returned to work at the NRO office in late June/early July, and Defendant reinstated Plaintiff's PTO that she had used during the period of leave. Dkt. 27, DSF 26; Dkt. 33, PSF 18 & n.1.[6]

32. On July 22, 2021, due to the Delta Variant of the SARS COVID virus, the NRO updated its requirements to require all unvaccinated personnel to wear a mask at all times while on NRO or NRO-occupied property, including all offices and conference rooms. The guidance provided an exception for "single occupant hard-walled offices." The guidance provided: "Contractor personnel who refuse to wear a mask as detailed above will be reported to the appropriate Contracting Officers Technical Representatives or Contracting Office for appropriate contract administration action." Dkt. 27, DSF 27; Dkt. 33, PSF 20.

---

[6] The parties differ regarding whether Plaintiff returned on June 28, 2021 or in "early July." Ultimately, this does not appear to be a material dispute.

33. Around July 25, 2021, Defendant told Plaintiff to submit a second reasonable accommodation request and that, pending action on that request, Plaintiff would be required to take leave.  On July 25, 2021, Plaintiff submitted another reasonable accommodation request, asking that NRO "determine that I am exempt from the policy of wearing a mask/facial covering at all times or at minimum to be able to remain unmasked while I am at my desk."  As another option, Plaintiff requested "to [be] provide[d] a single person office."  Dkt. 27, DSF 27; Dkt 33, PSF 21-22; Dkt. 29-3.

34. On July 29, 2021, Ms. Bailey emailed Plaintiff's request and doctor's note to Pamela S., the NRO Chief, Medical Services Team.  Ms. S determined that "[m]edically we cannot grant a mask waiver; therefore the accommodations staff should continue to work with her and her company on this issue."  Dkt. 33, PSF 23; Dkt. 29-18.

35. Later that evening, Ms. Bailey responded to Ms. S to state that the Office of Equality and Inclusion ("OE&I") would recommend that "the contractor provide Ms. Pratt with a hard walled office as a single occupant."  Dkt. 33, PSF 24; Dkt. 29-18.

36. On July 30, 2021, Mr. Palmieri advised Plaintiff not to come to the NRO unless she complied with the masking requirement, but informed Plaintiff that she could charge the time to the "COVID admin charge code" as long as she could make up all hours by September 30, 2021.  If Plaintiff failed to make up the hours, they would be deducted from her accrued PTO or used to reduce her pay.  Dkt. 33, PSF 25-26.

37. On August 3, 2021, Mr. Palmieri again advised Plaintiff to use the COVID admin charge code or to use her PTO during the period while they were working on identifying a potential accommodation.  On August 5, 2021, he advised Plaintiff that she would have until January 31, 2022 to make up hours charged to the COVID admin charge code.  Dkt. 27, DSF 31.

38. On August 6, 2021, Ms. Bailey advised Plaintiff that the NRO had denied Plaintiff's request for an exemption from the mask policy.  Ms. Bailey further informed Plaintiff that there was an updated NRO Covid-19 Policy, effective August 5, 2021, which required that all unvaccinated personnel are required to wear a mask or approved face covering at all times while on NRO property or inside an NRO-operated facility regardless of social distancing or physical barriers between personnel.  The policy had an exception for single-occupant offices.  Ms. Bailey indicated that a Randy R. would work with Plaintiff to identify an accommodation.  Dkt. 27, DSF 29; Dkt. 33, PSF 27 and 37.

39. Plaintiff was aware that she needed an accommodation rather than an exemption to return to work at the NRO site.  Dkt. 27, DSF 30.

40. On August 23, 2021, Plaintiff began taking unpaid leave, because she did not think that she would be able to make up time charged to the COVID admin code.  Dkt. 33, PSF 29.

41. Space at NRO was at a premium due to the shifting of personnel into different office spaces to meet social distancing requirements. Dkt. 27, DSF 32.[7]

42. Mr. Palmieri suggested to NRO Government Group Chief Randy Rogers that Mr. Palmieri could move to another office so Plaintiff could have a private office, but Mr. Palmieri was advised that this was not possible. *Id.*, DSF 34.[8]

43. Defendant has office space in four buildings in Chantilly, Virginia and 18 office locations within 30 miles of the NRO office. Dkt. 33, PSF 39 and 45.

44. At an office located at 4801 Stonecroft Boulevard (the "Stonecroft Office"), Defendant had space within a SCIF for employees on the NRO project. *Id.*, PSF 40. Mr. McGibney worked in the Chantilly office on the NRO project for a period of time. *Id.* PSF 42. Mr. McGibney's Chantilly office-space was shared with Project Manager Anne Daugherty and later Kim Pinkston-Haper, although they were not always in the office. Dkt. 33, PSF 44.

45. Whether Plaintiff could work from SAIC offices was considered, but this was complicated by the fact that not all SAIC office spaces were able to accommodate classified work and working from an SAIC office required NRO approval. At some point, the NRO offered to let Plaintiff work from SAIC offices, but "it had to be a SCIF, it had to be a connectivity to the network" and there were other relevant details. SAIC Vice President Joel Balzer evaluated whether there was available space at SAIC offices but determined that there was not "an available private office that was available." Dkt. 27, DSF 35; Dkt. 33, PSF 38; Dkt. 29-7 at 39; Dkt. 27-5 at 60.

46. Defendant did not look beyond the Chantilly offices for a location for a private office for Plaintiff, did not make efforts to install walls or barriers to create a private office

---

[7] Defendant asserts an additional fact regarding Plaintiff's awareness of Defendant's authority within NRO, but read in context, the cited portion of the deposition does not support Defendant's asserted fact. *See* Dkt. 27, DSF 33; Dkt. 27-1 at 153-154 ("SAIC has – has their own – they have spaces that they control inside the NRO. And so they could make accommodations, arrange things differently, put people here, move someone there, move someone over there. That is the solutions that they have control over inside the NRO.").

[8] Plaintiff purports to rely on testimony by Mr. Rogers to assert that Plaintiff and Mr. Palmieri had an agreement not to wear masks in their shared office space in contravention of NRO policies. Dkt. 33, PSF 35-36. The cited authority does not support this. Mr. Rogers testimony is that *in May 2021*, in accordance with the then-applicable NRO guidance requiring masking in public spaces, Plaintiff would not mask in the shared two-person office. Dkt. 29-5 at 3 ¶ 5 (referring specifically to May 2028 and the determination that Plaintiff could wear a scarf as a face-covering). Mr. Palmieri's testimony was that: "There were times that [Plaintiff] would wear a mask. I don't know when she took it off if it was within guidance or not. I don't recall exactly." Dkt. 29-7 at 9:7-9. He also testified that they did not have an agreement regarding Plaintiff not wearing a mask. *Id.* at 9:10-14. Accordingly, the record does not support Plaintiff's asserted fact.

for Plaintiff, and did not ask other employees whether they would be willing to move offices. Dkt. 33, PSF 55-61.

47. Defendant also evaluated whether there were other contracts on which Plaintiff could work remotely and Mr. Balzer made efforts to pass along Plaintiff's resume to individuals involved in another SAIC contract with NASA. Dkt. 27, DSF 37.[9]

48. Defendant did search for other job opportunities for Plaintiff within the company and took steps to determine whether Plaintiff could support the NRO by teleworking, but that was not part of the NRO contract. Dkt. 27, DSF 36 and 38.

49. On August 13, 2021, the NRO and Defendant leadership sought approval from Director Dr. Susan Durham for Plaintiff to telework. Dr. Durham indicated that, given the type of work, telework was not a "viable long-term solution" and that she would only approve up to four weeks of telework. Dkt. 33, PSF 62; Dkt. 29-26; Dkt. 27, DSF 41.

     a. Plaintiff would not have been able to perform her regular duties while teleworking. It was a stopgap and involved a lengthy signoff process that Defendant and the NRO terminated when Plaintiff left SAIC. Dkt. 33, PSF 64; Dkt. 29-4 at 77:5-77:5; Dkt. 27, DSF 39.

50. On August 19, 2021, Mr. Palmieri advised Plaintiff that the telework approval was nearing the end of the process and explained that the process entailed approvals and contract modifications. Dkt. 27, DSF 40.

51. At the end of the four-week period, Defendant hoped that one of the other contracts, in particular, the NASA contract, would come through and be a long-term solution for Plaintiff. Dkt. 27, DSF 42.

52. At the same time, on August 24, 2021, Mr. McGibney advised that, at the end of the four-week period, Plaintiff would have to be moved to a different contract vehicle. Dkt. 33, PSF 65.

53. Mr. McGibney drafted memorandum which would: (i) formally remove Plaintiff from the NRO project; (ii) put Plaintiff in leave without pay status for four weeks; (iii) encourage Plaintiff to apply to other SAIC contracts for another position; and (iv) indicate that, if SAIC and Plaintiff could not find another position for Plaintiff by the end of the four-week period, Plaintiff would be terminated. *Id.*, PSF 66; Dkt. 33-3.

54. Human resources also began preparing documents "just in case [Plaintiff is] unable to find another position." *Id.*, PSF 67; Dkt. 33-4.

---

[9] Plaintiff notes that there are no documents associated with these efforts and that Plaintiff was never offered a position on any other contract. Dkt. 33, PSF 33-34

55. On June 10, 2021, Plaintiff received an offer letter from Strategic Alliance Consulting ("Strategic Alliance") with a greater salary than what she received from Defendant. Dkt. 27, DSF 43 and 46.

56. On June 11, 2021, Plaintiff accepted the job offer from Strategic Alliance, but did not notify anyone with Defendant about her acceptance of the position with that company. *Id.*, DSF 44-45.

57. Plaintiff began working for Strategic Alliance on August 20, 2021, while Defendant and NRO were actively working on the teleworking accommodation. *Id.*, DSF 46. Plaintiff still did not tell Defendant about her work for Strategic Alliance. *Id.*

58. On August 20, 2021, Plaintiff still completed a timecard for Defendant utilizing leave, despite working for Strategic Alliance. *Id.*, DSF 47.

59. On August 30, 2021, Mr. Palmieri emailed Plaintiff that he needed to speak with Plaintiff and for her to give him a call. *Id.*, DSF 48.

60. On August 31, 2021, Plaintiff emailed Mr. Palmieri stating: "I am thinking the way forward might not be with SAIC." *Id.*; Dkt. 33, PSF 70.

61. Later that day, Defendant learned that Plaintiff was working for Strategic Alliance because the government informed Defendant that Plaintiff's common access card needed to be reassigned from the NRO to another government agency. Dkt. 27, DSF 49; Dkt. 33, PSF 71.

62. Plaintiff never informed Defendant that she had taken a job with and had started working for Strategic Alliance while she was still employed by Defendant. Dkt. 27, DSF 49.

63. Mr. Palmieri then emailed another SAIC employee, that the "telework is still going through the approval process" and that it was unlikely that "any determination will be made by this Friday." He further stated: "With the ongoing delay in the telework, the point of all this is to state when she will be terminated if she does not identify chargeable work." Dkt. 33, PSF 71.

64. During a phone call on September 2, 2021, Mr. Palmieri asked Plaintiff if she intended to submit a formal resignation. Plaintiff replied that she had been constructively discharged. *Id.*, PSF 72.

65. To account for the COVID admin leave hours, Defendant deducted money from Plaintiff's final paycheck. *Id.*, PSF 73.

66. Plaintiff filed her EEOC Charge on May 19, 2022. Dkt. 1.

### III.   LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

### IV.   ANALYSIS

Plaintiff's Complaint asserts four causes of action: (i) ADA disability discrimination based on her alleged constructive discharge (Count 1); (ii) ADA retaliation based on her alleged constructive discharge (Count 2); (iii) ADA disability discrimination based on Defendant requiring Plaintiff to take leave (Count 3); (iv) ADA retaliation based on Defendant requiring Plaintiff to take leave (Count 4); and (v) failure to accommodate.  Defendant seeks summary judgment with respect to each count.  Plaintiff opposes summary judgment.  Defendant's arguments with respect to each Count will be addressed below.

#### A.   Whether Counts 3 and 4 are Time-Barred

Defendant first argues that Counts 3 and 4 are time-barred to the extent that they are based on leave taken prior to July 23, 2021.  Dkt. Nos. 27 at 12; 34 at 2.  As Defendant correctly notes, a plaintiff has "300 days from the last date of discrimination to file a charge with the EEOC."

11

*McClarigan v. Riverside Hosp., Inc.*, 2022 WL 3588031, at *4 (E.D. Va. Aug. 22, 2022). If that period elapses, the plaintiff is barred from seeking relief under the ADA. *Id.* Here, Plaintiff filed her EEOC Charge on May 19, 2022. Dkt. 1 ¶ 13. Thus, the 300-day lookback period extends to July 23, 2021.

Counts 3 and 4 relate to Defendant requiring Plaintiff to take leave based on her vaccination status and inability to comply with mask requirements. Defendant twice required Plaintiff to take such leave: first, from May 28, 2021 through June 28/"early" July and, second, from July 30, 2021 through the conclusion of her employment. Defendant argues that Plaintiff cannot base any claim on this first period of leave because it is outside the 300-day lookback period. Plaintiff does not address this argument. Dkt. 33 at 17. Instead, Plaintiff asserts that Counts 3 and 4 are based on the second period of leave, from July 30, 2021 through the conclusion of her employment. *Id.* All parties agree that the second period of leave is not time-barred. Accordingly, to the extent that Counts 3 and 4 are based on leave from May 28, 2021 through June 30/early July, the Motion will be granted, as claims based on that time period are time-barred.

### B.    Whether Counts 3 and 4 Assert an Adverse Action

To the extent that Plaintiff relies on being on leave from July 30, 2021 through the conclusion of her employment to support Counts 3 and 4, Defendant argues that the taking of such leave does not constitute an adverse employment action or adverse action as needed to support an ADA discrimination or ADA retaliation claim. Dkt. 27, 14 n. 1. This argument is raised only in a footnote. The Fourth Circuit "warn[s] against ruling on a 'minimally addressed' issue based on arguments only raised in a footnote, as it is 'unfair' to the opposing party 'and would risk an improvident or ill-advised opinion on the legal issues raised." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 278 (4th Cir. 2022). Accordingly, the Court rejects this argument without

12

prejudice. Defendant will be permitted to file a renewed motion for summary judgment that more fully addresses the issue, based upon the statement of facts set forth in this Memorandum Opinion and Order. Any renewed summary judgment briefing should address how much of the second set of leave is attributable to decisions by Defendant (as opposed to Plaintiff's need to take leave so that she could begin employment with Strategic Alliance).

C.    Whether a Reasonable Jury Could Determine that Plaintiff Was Constructively
Discharged

Plaintiff's claims in Counts 1 and 2 rely on her being constructively discharged. Dkt. 1. Defendant argues that, as a matter of law, Plaintiff was not constructively discharged. Dkt. 27, at 14-15. A plaintiff may establish a constructive discharge by showing that her employer "deliberately made [her] working conditions intolerable in an effort to induce [her] to quit." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). But, as the Fourth Circuit has noted, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* Here, Plaintiff's argument is that her placement on leave constitutes intolerable conditions such that she was forced to quit.

Notably, Plaintiff does not allege *when* she was constructively discharged. It is undisputed that Plaintiff took the position with Strategic Alliance on June 11, 2021, before the NRO had evaluated her initial reasonable accommodation request. Dkt. 27, DSF 44 (citing Plaintiff's deposition testimony and exhibits, which reflect her acceptance of the position on June 11, 2021).[10]

---

[10] This stark omission appears strategic, given that Plaintiff's June 11, 2021 decision to leave her position falls well outside the 300-day lookback period and thus would be time-barred. Although the Court does not rely on the time-barred nature of the June 11, 2021 decision because it was not raised by Defendant, the Court notes that this could potentially be another basis for summary judgment if asserted by Defendant.

Moreover, her offer of employment – which she signed – reflected an anticipated start date of July 12, 2021. Dkt. 27-1 (Exhibit 9 to the deposition). That position was to be "full-time." *Id.* Thus, Plaintiff had already determined that she would be leaving Defendant in June 2021 and that her last day of work would be in July 2021 – well before the second period of leave was ever contemplated. Indeed, even after Plaintiff's start date with Strategic alliance was apparently pushed back to August 20, 2021, Plaintiff took leave from her position with Defendant in order to complete her "full-time" duties with Strategic Alliance.[11]   Plaintiff's attempt to reframe her decision to resign as being made in late August or early September 2021 is unpersuasive. *See Gallimore v. Newman Machine Co., Inc.*, 301 F. Supp. 2d 431, 452 (D. Md. 2004) (holding no constructive discharge where Plaintiff decided to resign, as reflected in his diary, before he was reassigned to another department).

With the constructive discharge claim appropriately reframed as occurring on June 11, 2021, the Court examines whether a reasonable juror could determine that Plaintiff was constructively discharged. The Court finds that a reasonable juror could not. At the time that Plaintiff decided to resign, she had submitted a request for an accommodation to NRO, which had only been under review for approximately two weeks, and Plaintiff had been taking PTO (which was subsequently reinstated). Courts have rejected finding that an employee was constructively discharged where the employee is required to take leave pending the resolution of an accommodation issue. *See, e.g., Adkins v. Willis*, 214 F. Supp. 3d 1190, 1200 (N.D. Ala. 2016) (granting summary judgment in favor of defendant where plaintiff was placed on leave pending resolution of a fitness for duty examination and where plaintiff accepted new position in the

---

[11] In arguing that her constructive discharged occurred sometime in late-August or September 2021, Plaintiff never addresses how she could work for both employers *without* taking leave from one or the other.

interim); *Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832, 865-66 (E.D. Mich. 2017) (finding no constructive discharge where "Ford placed Plaintiff on full paid leave while it investigated his accommodation request – a far cry from forcing him to endure intolerable working conditions") *aff'd* 716 F. App'x 519 (6th Cir. 2017);[12] *cf. EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) ("Manning's choice to resign was 'grossly premature' . . . a reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her."). Indeed, as discussed further *infra*, courts have recognized that even

---

[12] Plaintiff cites *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605 (6th Cir. 2020) for the proposition that Plaintiff being forced to take leave constitutes a constructive discharge. Dkt. 33 at 22. Not so. In *O'Donnell*, the Sixth Circuit found that the plaintiff there was constructively discharged when she was placed on a leave of absence. The Sixth Circuit explained, however, that "[t]he moment a person is placed on an unpaid leave of absence, especially where as here it purportedly is in an effort to give a person time to rejoin a previous position, with some prospect that it would occur, the action may not be adverse." *Id.* at 619. In the circumstances of this case, the June 2021 leave was intended to give the NRO time to assess the reasonable accommodation and, indeed, Plaintiff did rejoin her prior position and had her PTO restored. Thus, this was not the circumstance described in *O'Donnell*. Indeed, the circumstances of *O'Donnell* were premised on the employee resigning when there was "no apparent prospect of [the reasonable accommodation] being resolved satisfactorily." *Id.* Here, by contrast, within a relatively short period of time, Plaintiff was authorized to wear the face-covering she requested and to return to work and she did return to work. Despite all of these factors, Plaintiff also obtained and accepted a new position with Strategic Alliance and did not inform Defendant. Moreover, to the extent the constructive discharge can plausibly be based on Defendant's discovery that Plaintiff had surreptitiously been working a new job while still employed by Defendant, this case falls within the exception noted in *O'Donnell* for a person placed on leave who had an expectation to rejoin her prior position. Plaintiff had every reason to believe that she would rejoin her position given that: (i) it had happened before; and (ii) she knew that Defendant and the NRO were working on a telework agreement.

*EEOC v. Costco Wholesale Corp.*, 903 F.3d 618 (7th Cir. 2018) cited by Plaintiff is inapposite because it did not involve a constructive discharge. *Id.* at 629 (recognizing that an employee who is fired cannot bring a constructive discharge claim). Rather, in that case, the Seventh Circuit held that the EEOC could recover backpay if it could show that the employee "would have felt forced by unbearable working conditions to take an unpaid medical leave." *Id.* Those are not the circumstances here.

involuntary leave can be a reasonable accommodation. *See, e.g., Moore v. Md. Dep't of Public Safety & Corr. Servs. Patuxent Inst.*, 2013 WL 549864, at \*4 (D. Md. Feb. 13, 2013) (holding that placing plaintiff on medical leave without pay was a reasonable accommodation).

"Unless an employer is given sufficient time to remedy the situation, a constructive discharge generally will not be found to have occurred." *Luna v. Walgreen Co.*, 347 F. App'x 469, 473 (11th Cir. 2009). Here, Plaintiff only provided Defendant with two weeks to obtain consent from the NRO via the requested accommodation before Plaintiff obtained another job. Moreover, Plaintiff did not even resign until more than two months later and not only continued to work for Defendant after obtaining a new offer of employment but continued to work for Defendant (albeit on leave) after her first day of full-time employment with Strategic Alliance.[13]  *See, e.g., Champlain v. City of Folsom*, 2005 WL 3299520, \*5 (E.D. Cal. Dec. 6, 2005) ("Plaintiff appears to have taken his time, weighed his options for employment, and only after he secured another job did he resign from his employment with defendant. Defendant is entitled to summary judgment on this claim because a reasonable jury could not find that plaintiff resigned because of the alleged intolerable conditions."); *Brod v. Spring Corp.*, 2022 WL 479521, at \*6 (S.D. Texas Jan. 28, 2022) ("Although the test for constructive discharge is an objective one, Brod's own testimony that he waited to resign from Sprint indicates that, at least in his own opinion, his work conditions were not so intolerable that he was compelled to resign even absent or before he had secured a new job."); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 606 F. Supp. 2d 427, 447 (S.D.N.Y. 2009), *aff'd in part*, 663 F.3d 556 (2d Cir. 2011) (holding that "searching for another job while [the employee] remained employed" militates against a constructive discharge claim). These

---

[13] Strategic Alliance's time records reflect that Plaintiff worked 9 hours on August 20, 2021, 8 hours on August 23, 2021, 9 hours on August 24, 2021, 9 hours on August 25, 2021, 5 hours on August 26, 2021, and 8 hours for the following week. Dkt. 27-6 at Exhibits 5 and 6.

circumstances are not sufficient to establish intolerable working conditions or a constructive discharge.

Even assuming *arguendo* that Plaintiff is correct that her resignation should be viewed as occurring in late August 2021 or early September 2021, Plaintiff has not established that the circumstances she faced at that time constitute a constructive discharge. At that point, Plaintiff was aware that Defendant was seeking a telework arrangement for her. Dkt. 33, PSF 72. Moreover, although Plaintiff was on unpaid leave as of August 23, 2021, that was a choice that she made even though she had the options of taking PTO or charging the time to a COVID admin code. Dkt. 27, DSF 31.[14] Additionally, Defendant investigated whether it could provide Plaintiff with a private office from which she could perform her work (a task that was of course complicated by the fact that Plaintiff worked with classified NRO materials) and would have provided Plaintiff with the opportunity to apply for another contract on which it performed work. That Plaintiff might ultimately have been terminated if she and Defendant were unable to find a contract for which she could bill her time or perform work does not demonstrate that Plaintiff's conditions were intolerable. *See Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993) (holding that courts should not view every failure to accommodate as a constructive discharge); *Gandhi v. Brownlee*, 2004 WL 3241661, at *10-*11 (E.D. Va. July 2, 2004) (holding that resigning in order to avoid termination does not, in itself establish constructive discharge). [15]

_____

[14] Plaintiff makes much of the fact that she was on unpaid leave and that her "livelihood" was threatened, but she had already started new employment where she was earning a higher salary at the time that she views herself as being constructively discharged. Dkt. 33 at 19; Dkt. 27, DSF 46.

[15] Also missing from the parties' arguments regarding both constructive discharge as it pertains to the second period of leave and to the reasonable accommodation claim is how Plaintiff could perform the essential functions of her job where she worked with classified information and where, in light of her vaccination status and inability to mask, Plaintiff was not permitted inside

In sum, Plaintiff has failed to demonstrate facts from which a reasonable juror could determine that she faced intolerable working conditions such that she was constructively discharged in June 2021 (when she took the new position) or in late August/early September (when she officially resigned after having already begun working for another company). *See Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 187 (4th Cir.2004) ("Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this Circuit has insisted that it be carefully cabined."). Accordingly, the motion will be granted with respect to Counts 1 and 2.

D.     Whether A Reasonable Jury Could Determine that Defendant Failed to Accommodate Plaintiff

To prevail on a claim that Defendant failed to provide Plaintiff with a reasonable accommodation, Plaintiff must establish: (i) that she had a disability for purposes of the ADA; (ii) that her employer knew of her disability; (iii) that a reasonable accommodation would permit Plaintiff to perform the essential functions of her job;[16] and (iv) that her employer refused to make

---

the NRO's buildings. The record on summary judgment suggests that, given that Plaintiff worked with classified information, any accommodation sought would require a revision of Defendant's contract with the NRO and a change to Plaintiff's essential job functions. *See Elledge v. Lowe's Home Ctrs., LLC,* 979 F.3d 1004, 1013 (4th Cir. 2020) (recognizing that "employers do not need to change a job's essential functions"); *see also Carrozz v. Howard Cnty., Md.,* 45 F.3d 425 at *2 (4th Cir. Jan. 10, 1995) (Unpublished) ("In this case, the 'essential functions' of Carrozza's job included working with the computer and maintaining acceptable standards of conduct within an office environment."); *Beatty v. PruittHealth, Inc.,* 2022 WL 3681918, at *5 (M.D.N.C. Aug. 25, 2022) ("Given that an essential function of Plaintiff's job was to work in-person each day at the center, and her condition prevented her from doing that, she has not plausibly alleged that she is a qualified individual.").

[16] The Court notes that, although the parties have not discussed the issue, courts have held that an employee who cannot comply with a valid safety requirement for her position will "not be considered qualified." *Kinney v. St. Mary's Health,* 76 F.4th 635, 643 (7th Cir. 2023) (holding that person who refused to follow a mask mandate "was not a qualified individual for her position

the accommodation. *Wirtes v. City of Newport News*, 996 F.3d 234, 238-39 (4th Cir. 2021). Once an employer's responsibility to provide a reasonable accommodation is triggered, it may be necessary for the employer to engage in an "interactive process" to determine the appropriate accommodation under the circumstances. 29 C.F.R. § 1630.2(*o*)(3); *see also Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 311-12 (3d Cir. 1999) (finding that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith"); *Haneke v. Mid–Atlantic Capital Mgmt.,* 131 F. App'x 399, 399-400 (4th Cir. 2005) (unpublished) (finding that "[i]mplicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation"). Defendant does not challenge the first two elements of this test.

As an initial matter, the Court assumes without deciding that a reasonable accommodation request made to the NRO suffices as a reasonable accommodation request to Defendant. Moreover, the Court focuses solely on the second request to the NRO on July 25, 2021 as the basis for this reasonable accommodation claim. Dkt. 27, DSF 27; Dkt 33, PSF 21-22; Dkt. 29-3.[17] In her request to the NRO, Plaintiff asked that the NRO "determine that I am exempt from the policy of wearing a mask/facial covering at all times or at minimum to be able to remain unmasked while I am at my desk," and, as another option, Plaintiff requested "to provide a single person office." Dkt. 27, DSF 27; Dkt 33, PSF 21-22; Dkt. 29-3. Here, Plaintiff has not identified a reasonable

---

and that she was seeking an accommodation that would not be reasonable under the circumstances").

[17] It is undisputed that the first reasonable accommodation request that Plaintiff made was granted, in that Plaintiff was permitted to wear the scarf as a face covering in common areas as she requested. Dkt. 27, DSF 25; Dkt 33, PSF 17.

accommodation that would permit her to perform the essential functions of her job and has not established that Defendant denied her a reasonable accommodation.

To begin with, Plaintiff makes no argument that exempting Plaintiff from the mask policy was a reasonable accommodation request.[18] Plaintiff does not challenge that the NRO – which is not controlled by Defendant – was permitted to control its own workspaces and make safety protocols as it saw fit. Instead, Plaintiff's argument focuses on asserting that Defendant should have provided her with a private office as a reasonable accommodation and on asserting that telework and unpaid leave were not reasonable accommodations. Plaintiff does not dispute that, to perform the classified work that was part of the contract with the NRO, Plaintiff would require access to a SCIF. Dkt. 27, DSF 5-7. Plaintiff also does not dispute that any accommodations that related to the classified materials would need NRO approval. *Id.*, DSF 36-38. Plaintiff was aware that Defendant was seeking approval for her to telework from the NRO. Dkt. 33, PSF 63.

Here, it is clear that Defendant and the NRO – to whom Plaintiff made the request for an accommodation – attempted to engage in an interactive process with Plaintiff. Although Plaintiff now objects to telework as a proposed reasonable accommodation, Plaintiff does not contend that Plaintiff ever objected at the time. *See Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir, 1999) ("While Loulseged now goes into great detail about the manifest injustice of the one-gallon proposal, she failed to vocalize any of these concerns at the time she allegedly realized that she was expected to use the container."); *Berkner v. Blank*, 2013 WL 951562, at *7 (D. Md. Mar. 11, 2013) (recognizing that a defendant cannot be liable where a plaintiff failed to engage in the

---

[18] To the extent Plaintiff attempts to manufacture a disputed issue of fact concerning whether the NRO required Plaintiff to comply with its mask policy, the record is clear that it did because the NRO specifically rejected Plaintiff's requests for exemptions from that policy. Dkt. 27, DSF 29; Dkt. 33, PSF 27.

interactive process) *aff'd* 561 F. App'x 279 (4th Cir. 2014) (*per curiam*).  Courts hold employees responsible for the breakdown of the interactive process where an employee maintains a "stony silence" in the face of an offered accommodation and then "rob[s] [the employer] of a chance to complete the process and demonstrate good faith" by quitting.  *Id.*; *see also Watson v. Drexel*, 2020 WL 5763587, at *5 (E.D. Pa. Sept. 28, 2020) (rejecting reasonable accommodation claim where the employer "had every reason to believe that [the employer's] proffered reasonable accommodation – intermittent FMLA leave – was sufficient to accommodate Watson, and Watson never indicated otherwise").  The summary judgment records reveals that Plaintiff never voiced a dissatisfaction with telework during the interactive process and withdrew from the process before Defendant had obtained permission from the NRO to have Plaintiff engage in telework.  *See Saraceni v. Retting*, 2024 WL 1329033, at *21 (N.D.N.Y. Mar. 28, 2024) (rejecting reasonable accommodation claim where Plaintiff was dissatisfied with an interim accommodation and then retired from employment); *Noel v. BNY-Mellon Corp.*, 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011) ("[A]n employee who withdraws from the interactive process cannot later allege failure to accommodate.").  Here, the undisputed facts suggest a reasonable juror would determine that it was Plaintiff who acted in bad faith.  Plaintiff had already accepted a job offer elsewhere and, outside of making her request for an accommodation to the NRO and one phone call to Mr. Palmieri regarding the telework accommodation (to which she silently objected), apparently never engaged in any discussion of her request again before claiming to have been constructively discharged.  *Goos v. Shell Oil Co.*, 451 F. App'x 700, 702 (9th Cir. 2011) (finding that "lack of candor" contributed to breakdown of the interactive process).

Likewise, Plaintiff does not put forward any facts indicating that she objected to being placed on leave as an interim accommodation.  Again, this reflects a failure of Plaintiff to engage

in the interactive process. Nor does Plaintiff assert that there was an immediately available reasonable alternative.[19] Courts have held that defendants can reasonably accommodate employees who have difficulty complying with safety policies by placing them on even unpaid leave until a better accommodation can be reached. *See, e.g., Clayborne v. Potter*, 448 F. Supp. 2d 185, 192-93 (D.D.C. 2006) (holding defendant provided a reasonable interim accommodation where defendant placed plaintiff on leave for a year due to safety concerns until another accommodation could be identified); *Moore v. Md. Dep't of Public Safety & Corr. Servs. Patuxent Inst.*, 2013 WL 549864, at *4 (D. Md. Feb. 13, 2013) (holding that placing plaintiff on medical leave without pay was a reasonable accommodation); *Busha v. S.C. Dep't of Mental Health*, 2017 WL 9289389, at *8 (D.S.C. Aug. 31, 2017) (finding that enforced unpaid leave pending receipt of a fitness for duty letter was a reasonable accommodation); *cf. Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1108 (D. Colo. 2021) (holding, in the context of a Title VII religious belief accommodation case, that plaintiff was unlikely to succeed on the merits of her claim where defendant placed her on unpaid leave due to COVID-19 pandemic). This is especially true where employers were dealing with the fraught circumstances surrounding the COVID-19 pandemic. Given the nature of Plaintiff's classified work and the safety concerns reflected in both the NRO's and Defendant's masking policies, Plaintiff has not identified any reasonable accommodation that would have been immediately available and still have permitted Plaintiff to have worked on the NRO contract. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015) (holding "an employer will not be liable for failure to engage in the interactive process if the

---

[19] The undisputed facts on summary judgment are that even non-classified research topics required the NRO's approval in order to be conducted from home due to operational security concerns. Dkt. 38, DSF 38.

employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position").

Plaintiff does not dispute that her work involved classified information for which there are certain sensitivities (including the requirement for a SCIF), that her work and place of work were governed by a contract, or that permitting Plaintiff to work outside of the parameters contained in the contract required approvals from within the government. Plaintiff nonetheless faults Defendant and the NRO for not immediately placing her on telework; however, that the process for approval of telework was delayed, and ultimately did not occur before Plaintiff's work for Strategic Alliance was discovered, does not demonstrate that Defendant denied Plaintiff a reasonable accommodation. At best, the delay here, was a month long and was due to obtaining approvals from the NRO. *See Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021) (holding that a "relatively short delay of a few weeks (or even a few months) in approving a request typically does not support [an unreasonable delay] claim"); *see also Pauling v. District of Columbia*, 286 F. Supp. 3d 179, 212 (D.D.C. 2017) (holding that, "[w]hile there were gaps in the chain of events and several delays, the defendant at no point ended the interactive process and, indeed, worked with the plaintiff until she received her requested equipment and was approved for telecommuting"); *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005) ("[A]n employee cannot base a disability discrimination claim upon an employer's delay in providing a requested accommodation where the delay is due to internal processing or to events outside the employer's control.").

Finally, Plaintiff claims to have been denied a private office at Defendant's offices as a reasonable accommodation. Dkt. 33 at 26.[20] Plaintiff does not point to any record evidence where

---

[20] Again, the Court assumes for purposes of this decision that the request that *NRO* provide a private office space translates to a request that *Defendant* provide Plaintiff with a private office space.

such a denial was made. Instead, the testimony from Defendant is that there was no appropriate private office space available. Dkt. 27, DSF 35; Dkt. 27-5 at 60. It is undisputed that locating an office from which Plaintiff could perform her NRO contracted work was complicated by the fact that not all SAIC office spaces could accommodate classified work and that, although at some point NRO offered to let Plaintiff work from SAIC offices, "it had to be a SCIF, it had to be a connectivity to the network." Dkt. 27, DSF 35; Dkt. 29-7 at 39. Plaintiff notes that Defendant had many office buildings within 30 miles of the NRO, but Plaintiff has not cited any record evidence that those office spaces could support Plaintiff's NRO work or that those office spaces were vacant (or otherwise not required for work on other projects). *See Buie v. Berrien*, 85 F. Supp. 3d 161, 175 (D.D.C. 2015) (holding that request for private office was not denied there were simply no vacancies); *Cross v. Brennan*, 2016 WL 4689042, at *9 (D.N.J. Sept. 6, 2016) (finding no failure to accommodate where "no office space available"); *cf. E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 355 (4th Cir. 2001) ("The ADA does not require reassignment when it would mandate that the employer bump another employee out of a particular position.").[21] Moreover, Plaintiff has not established that a private office at one of Defendant's offices would have been a satisfactory accommodation, because Defendant *also* had masking requirements. Dkt. 27, DSF 8; *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 482 (4th Cir. 2010) (holding that the plaintiff has the "ultimate burden of persuasion" to demonstrate an accommodation is reasonable and that the plaintiff had failed to show that a proposed reasonable accommodation was "an option").

---

[21] Although Plaintiff provides evidence regarding the number of offices held by Defendant, Plaintiff does not cite any record any evidence to dispute Defendant's conclusion that there was not an appropriate office available. Moreover, Plaintiff cites information explaining why an appropriate office would *not* be available – the Stonecroft Office, where some NRO work was performed by other employees, was undergoing construction. Dkt. 33 at 15.

Moreover, to construct a new office that would constitute a SCIF and satisfy the classified work requirements of NRO would take two years. Dkt. 34-2 at 82.[22]

In sum, no reasonable juror could determine that Defendant failed to engage in the interactive process regarding a reasonable accommodation or that Plaintiff was denied a reasonable accommodation. Here, the undisputed facts on summary judgment are that Plaintiff quit before an approval could be obtained for telework and that Plaintiff never objected to either leave or telework as interim accommodations. Thus, the Motion will be granted with respect to Count 5.

## V.    CONCLUSION

Defendant's Motion will be granted with respect to Counts 1, 2, and 5, because Defendant has established that no reasonable juror could determine: (i) that Plaintiff was constructively discharged or (ii) that Defendant failed to engage in the interactive process or denied Plaintiff a reasonable accommodation. Defendant's Motion will be granted with respect to Counts 3 and 4 to the extent those counts are based on events that occurred prior to July 23, 2021, but will otherwise be denied without prejudice to a renewed motion with respect to those counts because Defendant's other arguments were raised only in a footnote.

Accordingly, it is hereby ORDERED that the Motion for Summary Judgment (Dkt. 26) is GRANTED-IN-PART and DENIED-IN-PART. The motion is denied with respect to Counts 3

---

[22] The Court notes that Plaintiff does not raise the possibility of a contract reassignment with respect to her reasonable accommodation claim. It is worth noting that the record evidence is that Defendant initiated activity to find a contract on which Plaintiff could work and was prepared to let Plaintiff apply to work on other contracts for which she might be qualified. Plaintiff does not assert that she was qualified to work on any other contract assignments. Again, however, it appears that Defendant would have had to obtain approval for Plaintiff to work on other contracts as well. Dkt. 27, DSF 37 ("Mr. Balzer made efforts to reassign Plaintiff to a contract SAIC had with NASA and her resume was passed along to determine whether they could bring on Plaintiff.")

and 4 to the extent that those counts are premised on events after July 23, 2021, the motion is otherwise granted; and it is

FURTHER ORDERED that Defendant may file a renewed motion for summary judgment addressing the arguments made with respect to Counts 3 and 4 in docket 33, page 14, footnote 1 on or before September 27, 2024 in a brief of seven pages or less.  Plaintiff may then file a response to the renewed motion on or before October 11, 2024 of seven pages or less.  Defendant may then file a reply of three pages or less on or before October 18, 2024; and it is

FURTHER ORDERED that, if no renewed motion for summary judgment is filed, the parties are DIRECTED to file a notice with the Court requesting a final pretrial conference to set a date for trial on Counts 3 and 4.

It is SO ORDERED.

Alexandria, Virginia
September _11_, 2024

                                                              /s/
                                                    Rossie D. Alston, Jr.
                                                    United States District Judge